[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the Judicial District of Danbury. Many of the facts that give rise to this action are not in dispute. The plaintiff and the defendant, whose maiden name is Susan Schlich, were married on December 7, 1985, in Cold Spring, New York. The plaintiff has resided continuously in the State of Connecticut for at least twelve months immediately prior to the date of the filing of the complaint. The plaintiff and the defendant have two minor children, issue of the marriage, Meghan Schneider, born May 31, 1990; and Michael Schneider, born October 2, 1991. No other minor children have been born to the defendant wife since the date of marriage of the parties. The marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. The State of Connecticut has not contributed to the support of either party or the minor children. The parties moved to Connecticut from Long Island on or about August 1, 1994. The defendant left Connecticut and moved to New York in December of 1994. The plaintiff left Connecticut and moved to New York on or about December 31, 1995.
The court finds that each party is partially at fault for the breakdown of the marriage.
The parties separated in December of 1994. CT Page 8602
The plaintiff has a B.A. degree in economics. He obtained that degree prior to his marriage to the defendant. During the calendar year 1994, the plaintiff had business income of $1490 from his life insurance business. During the calendar year 1995, the plaintiff had taxable income from UNUM Life Insurance Company of $1219.89. He commenced working in mid-July, 1995, for Tri-Molden Plastics, Inc. His taxable income from Tri-Molden Plastics, Inc., in 1995 was $10,626. He also had taxable income, in 1995, from Massachusetts Mutual Life Insurance Company of $6448.12. He also had taxable income, in 1995, from MML Investors Services, Inc. of $716.49. MML Investors Services, Inc. is connected with Massachusetts Mutual regarding equities and mutual funds. He also had miscellaneous income between February of 1995 and January of 1996 from Massachusetts Mutual of approximately $570, plus an additional $150 from CBIA Health Insurance, which sums are not shown on his financial affidavit. The plaintiff's financial affidavit, dated March 6, 1996, shows, in Schedule A, a Sentra motor vehicle. The motor vehicle in question is a 1989 Nissan Sentra. The plaintiff is in agreement that that motor vehicle should be transferred to the defendant. His financial affidavit also shows, in Schedule A, a loan to RSS. That is a to a loan to his father in the amount of $25,000 that was used toward paying medical bills, hospital bills, credit cards and mortgage payments. He also shows a loan to Schlich with a balance of $5,456. That is a loan to the defendant's father that was made in 1987 when the family home was purchased. The parties lost money when the family home was resold. The plaintiff's financial affidavit shows liabilities as post-December, 1994 liabilities. Those are liabilities incurred by the plaintiff since the date the parties separated.
The plaintiff has incurred various liabilities since the parties separated in December of 1994. One of those liabilities is to his father, shown on his affidavit as a personal loan to R.F.S., with a balance of $16,100, of that amount, he borrowed $3190, on December 5, 1994, to pay for attorney's fees, and borrowed $7000, on February 7, 1995, for various expenses, including his lease and credit card loans. He borrowed $3000 from his father, on June 27, 1995, to use for miscellaneous expenses, and borrowed an additional $3000 from his father on November 9, 1995.
The plaintiff was employed, at the time the parties were married, doing office and clerical type work. His father was a majority owner of the business he was employed by. He left that employment in July of 1987 to seek a new career. At that time, he had a gross annual income of approximately $23,000. After leaving that employment, he was employed CT Page 8603 in the insurance business, for less than one year, by what was then the Home Life Insurance Company. He left that employment in 1988. In the summer of 1988, he was employed by Automatic Data Processing where he remained until the fall of 1991. His starting salary was in the low $30,000 range. He left as a result of a reorganization that was going on involving the sales unit and territorial assignments. In 1991, he was employed by Kavi Pharmacy, in excess of two years, until October of 1993, in the sales field. His income was in the mid $30,000 range. He left that employment due to a merger and an opportunity that he had for his own insurance business. All of his job changes were joint decisions with the defendant. Under his present insurance business, his primary carrier is Massachusetts Mutual. He also writes for other insurance companies. In July of 1995, he started a part-time job to increase his income. He spends in excess of forty hours per week in his insurance business, and spends approximately twenty hours per week in his part-time employment at his father's business at Tri-Plastics.
Under the plaintiff's insurance license, he is authorized to sell life insurance, accident insurance and health insurance in both New York and Connecticut. He is also authorized to sell mutual funds in Florida. Further, he can service existing clients who moved to Florida. He can also sell annuities. He also does estate planning in both Connecticut and New York. The plaintiff's financial affidavit, in Schedule B, shows gross weekly business income. That's his commissions from insurance and mutual fund sales.
During the calendar year 1992, the plaintiff had income from wages of $36,709. In the calendar year 1993, the plaintiff had income from wages of $32,702, and a business income of $1747.
The parties are in dispute regarding the plaintiff's income from both his primary employment in the insurance field and his secondary employment. The court finds that his financial affidavit, dated March 6. 1996, accurately reflects both his principal employment income and deductions, and his income and deductions from his secondary job, except to the extent that he shows a deduction from his principal employment for medical and dental insurance of $183 per week. The court finds that there is comparable health insurance available for the plaintiff and the children at a total cost of approximately $82 per week, and therefore only allows a deduction in the amount of $82 per week. The plaintiff has a greater earning capacity than the defendant.
The plaintiff presently carries health insurance through Massachusetts Mutual. The present cost of that insurance is approximately $800 monthly. The cost had been subsidized by Massachusetts Mutual CT Page 8604 previously with a cost to the plaintiff of approximately $250 to $300 monthly. Massachusetts Mutual does not presently subsidize that cost.
There are a number of alternate health insurance plans that are available that are much less expensive than the present plan carried by the plaintiff at a cost of $183 weekly. Defendant's Exhibit 22 shows seven other various health insurance plans and their monthly cost. A.U.S. Health Care plan is available at a cost of $352.30 for one parent and children, and at a family cost of $591.70 monthly, and a single cost of $199.10 monthly. A Metral-Health plan is available at a cost for one parent and children of $364.92 monthly, and at a family cost of. $631.25 monthly, and a single cost of $180.54 monthly. In calculating the child support guidelines, and in entering other financial orders, the court is basing the orders, in part, on the cost that would be available to the plaintiff if he obtained U.S. Health Care insurance. The court therefore finds that his net weekly income from his principal employment is minus $28.07, and his net weekly income from his secondary employment is $343, for a combined total net weekly income of $314.93.
The plaintiff commenced working for Tri-Molden Plastics in approximately July of 1995. He averages working there approximately twenty hours weekly.
The defendant has a B.A. degree in political science.
The defendant's financial affidavit, dated March 5, 1996, shows a joint liability to Mary and Bill Schlich, the defendant's parents, with a balance of $12,800. The balance due on that liability is $5400, and it is the same liability shown on the plaintiff's financial affidavit. The defendant's financial affidavit also shows her Bank of New York overdraft with a balance of $10,000. That is the same overdraft shown on the plaintiff's affidavit. The correct balance is $9463. Her affidavit also shows a liability to Discover with a balance of $4300. The correct balance is $4430.
The defendant's financial affidavit shows a USAA Mastercard joint debt with a balance of $5100. That Mastercard was used by both the plaintiff and the defendant, during the time they resided together, for such items as mortgage payment and food, and has a balance due of $5100.
The joint liability shown to her mother and father, Mary and Bill Schlich, with a balance of $12,800, is for funds advanced when the parties purchased a home in 1987. The correct balance is $5456. The liability to Richard Schneider, which is shown as a CT Page 8605 joint liability, is for medical expenses incurred by the defendant in approximately April of 1993. The plaintiff's financial affidavit also shows a debt to Visa of $1420, Sear's of $100 and Macy's of $100. Those were debts that she incurred after the parties separated.
The defendant has a Sally Mae student loan with a balance of $1450. That debt was incurred prior to the date the parties married.
The defendant's financial affidavit shows gross weekly wages from her employment of $121.50.
The defendant's current work hours are from Wednesday from 9:30 a.m. until 12:30 to 1 p.m. She works on Thursday from 4 p.m. until the office closes, which is usually between 8:30 and 9:30 p.m. She works on Saturday from 8:30 a.m. until anywhere from 2:30 p.m. to 5:30 p.m. The court is using the approximate average of those hours, which amounts to 16 hours per week at $9 per hour, which amounts to a gross weekly wage of $144, plus her social security income, in entering financial orders.
The defendant has worked during the marriage. She was employed prior to their marriage as a pharmacy technician. After the marriage, she was employed as a paralegal in New York until 1988. She ended that employment for medical reasons.
The defendant worked until December of 1990, when she was pregnant with her son. She stopped working until the summer of 1995, when she returned to work. Commencing the school fall term of September, 1996, both children will be attending school, and the plaintiff then intends to attempt to find full-time employment.
On February 13, 1996, an order was entered continuing the existing visitation order as modified so that on the weekends that the plaintiff has visitation through Sunday, the pickup time was to be 5 p.m. on Sunday evening. It was further ordered that the defendant shall be responsible for picking up the children from the plaintiff where the Sprain Brook Parkway intersects with the Cross County Expressway, which is exit 11. The plaintiff was to continue to be responsible for Saturday morning pickup of the children.
The parties are in dispute as to whether or not, at one point in time, they had an agreement on the issue of joint custody. The Family Relations study that was completed on June 27, 1995, CT Page 8606 states, in part:
 The mother initially indicated that she would like joint custody with the primary residence of the children to be with her. However, prior to the completion of a study, Mrs. Schneider indicated that she changed her mind and preferred sole custody, due to what she identified as Mr. Schneider's continued anger to her, and his non-cooperation with her suggestions regarding visitation and other issues.
The court finds, from all of the evidence presented, that the parties had originally agreed to a joint custody order during the spring of 1995.
The parties' daughter is enrolled in Catholic school at a cost of $168 monthly. The parties have been alternating paying that monthly charge.
Both parties have completed the parent education course. They also attended conciliation.
The parties are in dispute as to whether the court should enter an order of joint custody. The court finds, from the evidence presented, that it is in the best interests of the children that an order of joint custody should enter with any final decision-making to be with the defendant on any issues the parties cannot agree upon regarding the children.
After leaving the marital residence, on or about December 11, 1994, the defendant and the parties' two children resided with the defendant's parents until on or before March 25, 1995. She then moved with the children to Wappinger Falls, New York, where she now resides.
On Saturday mornings, the plaintiff is picking up the children at a deli near the defendant's job. On Sunday, the parties meet at Tucker Hill Road.
The defendant now resides at Wappinger Falls, New York. The plaintiff now resides at Lake Ronkonkona, Long Island. The distance from Wappinger Falls to their prior Danbury apartment was approximately 40 miles. The distance from Wappinger Falls to Lake Ronkonkona, Long Island, is approximately 111 miles.
There is pending, in New York, a lawsuit in which both the plaintiff and the defendant are parties. The same attorney represents both the plaintiff and defendant in that lawsuit.
The parties had originally placed a $2200 security deposit on CT Page 8607 the Danbury property that they leased. After the parties separated, the plaintiff arranged for the landlord to apply one-half of that security deposit to his rent.
The cost of COBRA insurance for the defendant under the plaintiff's health insurance will be $283 monthly, plus $29.07 for dental coverage.
Counsel for the minor children claims a total fee of $2200. She has been paid a total of $800 from the plaintiff. The court finds that the amount claimed is fair and reasonable.
The court has considered the provisions of § 46b-82
regarding the issues of alimony, and has considered the provisions of § 46b-81 (c) regarding the issues of property division, and has considered the provisions of § 46b-56 and § 46b-56a regarding the issues of custody and joint custody and visitation, and has considered the provisions of § 46b-84
and the child support guidelines regarding the issue of support, and has considered the provision of § 46b-62 regarding the issue of attorney's fees. The court enters the following orders:
A. BY WAY OF DISSOLUTION
1. The marriage between the parties is dissolved, and each party is declared to be single and unmarried.
B. BY WAY OF CUSTODY AND VISITATION
1. The parties shall have joint custody of the minor children whose primary residence will be with the defendant wife. Any dispute regarding the joint decision-making by the parties that is unable to be resolved will result in the defendant wife having the final decision-making. The court finds, from the evidence presented, that it is in the best interest of the minor children that an order of joint custody enter in this case.
2. The plaintiff is awarded specific visitation rights as follows: (a) alternating weekend from Saturday 8 a.m. to Sunday 7 p.m.; (b) alternating Saturdays from 8 a.m. to 6 p.m.; (c) each Thursday evening from 3:30 p.m. to 7 p.m.; (d) holidays are to be alternated in accordance with the following schedule:
 ...... Thanksgiving from Thursday 8 a.m. to Sunday 7 p.m. (The plaintiff to have odd numbered years beginning in 1997.)
...... Christmas Eve to Christmas Day from 12 noon CT Page 8608 Christmas Eve Day until 12 noon on the day after Christmas. (The plaintiff to have even numbered years beginning Christmas in 1996.)
 ...... Day after Christmas from 12 noon until 12 noon on December 30.
...... Easter from 8 a.m. to 5 p.m.
...... Each Mother's Day with Mrs. Schneider.
 ...... Each Father's Day with Mr. Schneider from 8 a.m. to 5 p.m.
 ...... New Year's Eve to New Year's Day from 5 p.m. to 5 p.m.
...... President's Day from 8 a.m. to 5 p.m.
...... Good Friday from 8 a.m. to 5 p.m.
...... Memorial Day from 8 a.m. to 5 p.m.
...... Veteran's Day from 8 a.m. to 5 p.m.
...... Fourth of July from 8 a.m. to 5 p.m.
...... Labor Day from 8 a.m. to 5 p.m.
 ...... The plaintiff will have some time to see the children on their birthdays (from noon to 5 p.m.).
Notwithstanding the above schedule, all Monday holidays shall be awarded to the party who has had the children on the previous weekend. When this results in the plaintiff having the weekend extended to include the Monday holiday, the children are to be returned by Monday at 5 p.m.
3. The pickup and return for all visitation is to take place at Tuckahoe Road in Westchester County, New York.
 ...... In the event either party moves from their present residence, that move may be the basis for changing the pickup and return schedule of the children.
C. BY WAY OF SUPPORT CT Page 8609
1. The court orders that the plaintiff pay to the defendant, by way of support, the sum of $97 weekly by immediate wage execution. This sum is substantially in accordance with the child support guidelines. The plaintiff is also ordered to provide health insurance and dental coverage for the benefit of the minor children. The health insurance and dental coverage is to be maintained for the benefit of the minor children for so long as he is obligated to pay support for each child. He has the option of continuing the health insurance with his present employment or he can provide the health insurance, including dental coverage, through either the U.S. Health Care plan or the Metral-Health plan, or any other comparable plan. The husband shall be responsible for 65 percent of any uncovered health or dental expenses, and the wife is responsible for 35 percent of any uncovered health expenses for the minor children.
2. The parties have to split equally the cost of the children attending private school.
3. The court orders that the plaintiff provide the defendant, on the first day of each month, with copies of all explanation of benefits that he gets from the health insurance carrier regarding health insurance for the defendant and the minor children.
4. The plaintiff shall maintain life insurance on his life in the amount of at least $250,000 with the minor children as equal beneficiaries. When the oldest child reaches eighteen, the life insurance shall then be maintained for the youngest child until that child reaches eighteen, at which time the plaintiff's obligation to maintain such life insurance shall terminate. The plaintiff shall have the right to claim the oldest minor child as a deduction for federal and state income tax purposes for each calendar year in which he is current, at the end of such calendar year, in his support payments and alimony payments if applicable.
D. BY WAY OF ALIMONY
1. The plaintiff is ordered to pay to the defendant alimony in the sum of $20 per week.
2. Alimony is to terminate on the earliest event:
(a) the death of the plaintiff; CT Page 8610
(b) the death of the defendant;
(c) the remarriage of the defendant;
(d) the youngest child reaching the age of 18.
The need for the defendant to have alimony when such age is reached will not be as great as it presently is.
3. The provisions of § 46b-86 (a) and § 46b-86 (b) are applicable. One of the grounds upon which alimony may be modified and/or terminated will be the final receipt of funds by the defendant from her pending lawsuit. The court leaves that determination to be made at the time such funds, if any are received, and it is known what that amount is.
4. The plaintiff is to provide health insurance for the defendant under COBRA for the maximum period allowed by law, including orthodontia coverage. The plaintiff is to pay 65 percent of such cost, and the defendant is to pay 35 percent of such cost.
E. BY WAY OF PROPERTY ORDERS
1. All of the proceeds that the defendant may recover from her pending lawsuit is awarded solely to the defendant. All of the proceeds that the plaintiff may recover from his pending lawsuit for loss of consortium is awarded solely to the plaintiff.
2. The court orders that all of the post-December, 1992, liabilities shown on the plaintiff's financial affidavit be paid by the plaintiff, and he holds the defendant harmless therefrom. The court orders that the following liabilities shown on the plaintiff's financial affidavit be paid as follows:
 (a) the Century auto loan is to be paid by the defendant and she is hold the plaintiff harmless;
 (b) the Honda auto loan is to be paid by the plaintiff and he is to hold the defendant harmless;
 (c) the personal loan RFS joint, and the overdraft checking, and the Discover Card, and the personal loan — Schlichs, are all to be paid one-half by the plaintiff and one CT Page 8611 half by the defendant, and each is to hold the other harmless for such one-half payment.
3. The court orders that the following liabilities, shown on the defendant's financial affidavit, be paid as follows:
 (a) USAA Mastercard and St. John's Episcopal Hospital be paid one-half by the plaintiff and one-half by the defendant.
4. The court orders that the Visa liability and the Sears liability and the Macy's liability and the Sally Mae liability, shown on the defendant's financial affidavit, be paid by the defendant, and she shall hold the plaintiff harmless therefrom.
5. The court orders that the plaintiff transfer to the defendant all of his right, title and interest in the Nissan Sentra automobile. All state and municipal fees that are required to be paid in connection with such transfer are to be paid by the plaintiff.
6. All personal property and furniture in the possession of the plaintiff is awarded to the plaintiff, and personal property and furniture and furniture in the possession of the defendant is awarded to the defendant.
7. All banking accounts shown on the plaintiff's financial affidavit are awarded to the plaintiff, and all banking accounts shown on the defendant's financial affidavit is awarded to the defendant.
8. The Oppenheimer Fund account, shown on the plaintiff's financial affidavit, is awarded to the plaintiff.
9. The deferred compensation assets, shown on the plaintiff's financial affidavit, is ordered divided equally between the parties by QUADRO. The defendant is to prepare the QUADRO. The court retains jurisdiction over any disputes that may arise involving the language of the QUADRO.
10. The court orders that the full security deposit on the apartment be turned over to the defendant.
11. All of the savings bonds, in the name of the children, are ordered to be turned over to the defendant. CT Page 8612
F. BY WAY OF ATTORNEY'S FEES
1. No attorney's fees are awarded in favor of either party.
2. The balance of the attorney's fees due to counsel for the minor children is to be paid equally between the plaintiff and the defendant.
G. MISCELLANEOUS ORDERS
1. The parties are to exchange copies of their federal and state income tax returns within thirty days after such returns have been filed, by certified mail return receipt, or registered mail return receipt, for so long as there is an outstanding alimony and/or support order.
2. Counsel for the plaintiff is to prepare the judgment file within thirty days and send it to the counsel for the defendant for signature and filing.
3. The court orders that the complete file be sealed and not be made available to any person until further court order.
4. To the extent that the plaintiff had the following items in his possession, he is to turn them over to the defendant within thirty days from today's date:
(a) her birth certificate;
(b) her baptismal certificate;
(c) her paralegal certificate;
(d) any and all of the children's bonds;
(e) the children's birth certificates and baptismal certificates.
Axelrod, J.